UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

CLAIRE DALY, by and through their
mother and general guardian, DANIELLE
DALY,

                Plaintiffs,

       v.

MILLER PLACE UNION FREE SCHOOL
DISTRICT, CHRISTOPHER
HERRSCHAFT individually, JOSEPH
ZITO individually, NICOLE FARLEY
individually, and LISA BRAY individually,

                Defendants.
------------------------------------------------------x

**MEMORANDUM AND ORDER**

2:23-cv-8601 (AMD) (SIL)

ANN M. DONNELLY, United States District Judge:[1]

       C.D., by and through her mother Danielle Daly, alleges that Miller Place Union Free

School District, superintendent Christopher Herrschaft, principal Joseph Zito, assistant principal

Nicole Farley, and teacher Lisa Bray deliberately ignored a pattern of sexual harassment and

bullying in violation of Title IX and Section 1983.  Before the Court is the defendants' motion to

dismiss the complaint.  As explained below, the motion is granted in part and denied in part.

## BACKGROUND[2]

       From 2017 to 2023, the plaintiff attended public schools operated by Miller Place.  She

started in kindergarten at Andrew Muller Primary School in 2017.  (ECF No. 51 ¶ 39.)  She alleges

---

[1] This case, originally assigned to the Honorable Rachel Kovner, was reassigned to this Court on October 21, 2025.

[2] The facts are drawn from the allegations in the complaint.  The Court draws all reasonable inferences in the plaintiffs' favor, and accepts the factual allegations in the amended complaint as true for purposes of this motion.  *See Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).

that another child, Q.C., routinely bullied her.  (*Id.* ¶ 40.)  Once, he pushed her up against the school bus and kissed her.  (*Id.*)  Another time, he sat on top of her, punched her in the face, and said, "I want to marry you."  (*Id.* ¶ 41.)  The school principal assigned an aide to watch Q.C. and gave the plaintiff a "card to put in her pencil box" so that she could signal the teacher if she felt "unsafe."  (*Id.* ¶¶ 43–46.)  That measure did not work. The plaintiff's mother "continued to receive" phone calls about Q.C.'s troubling behavior.  (*Id.* ¶¶ 44, 47.)

Q.C. transferred schools for first grade, but other students started to bully the plaintiff.  (*See id.* ¶ 51.)  At the school carnival, A.M. and A.T. told the plaintiff to "leave their table because they didn't want her there."  (*Id.*)  At some point, the plaintiff told her parents that she had "thoughts about hurting herself or others with her uncle's gun."  (*Id.* ¶ 52.)

Another student, C.F., also started bullying the plaintiff in second grade.  He called her a "nerd" because she did her homework on the bus.  (*Id.* ¶ 55.)  By the time the plaintiff started fourth grade at Laddie Decker Sound Beach Elementary School (*id.* ¶¶ 4, 64), the bullying took a sexual turn.  C.F. "moan[ed] sexually in" the plaintiff's ear and made "sexual comments" in class.  (*Id.* ¶¶ 66, 69.)  The plaintiff was afraid that "C.F. would come to the house," and "was scared to get on the bus."  (*Id.* ¶ 67.)  After her parents alerted the school, then–assistant principal Joseph Zito talked to C.F., and his teacher "allegedly disciplined" him, but C.F. "did not stop."  (*Id.* ¶¶ 68–69.)

In January 2022, the plaintiff confided to a classmate, A.M., that she "liked girls"; A.M. responded, "Ewww.  Why are you gay?"  (*Id.* ¶ 75.)  A.M. told her friends what the plaintiff said, and they teased the plaintiff about her sexual orientation.  (*See id.* ¶¶ 75–76.)  Other students accused the plaintiff of lying to them by "declaring she was not straight."  (*Id.* ¶¶ 77.)  A group of students spread other rumors—that the plaintiff was "weird" and "picks her nose," was "blind,"

and "two-faced," and "doesn't wipe her butt crack." (*Id.* ¶¶ 81–82.) A.M. warned students that "if [the plaintiff] hugs you that means she likes you, so don't let her." (*Id.* ¶¶ 81–82.)

Students made these remarks "in full view of staff," including fourth-grade teacher Jessica Warren. (*Id.* ¶ 84.) When the plaintiff's parents complained to Warren, she did not discipline the students and instead told the parents that "it was just 'girl drama.'" (*Id.* ¶ 90.) After some students told counselors that they did not want the plaintiff to hug them, the counselors told the plaintiff "not to hug the other girls because physical contact[] 'was not allowed at school.'" (*Id.* ¶ 93.) However, physical contact was allowed between other students—for instance, staff members prompted students to hug "when posing for class pictures." (*Id.* ¶¶ 100, 378.) At the school's "family awards ceremony," a teacher gave one of the bullies the "Good Friendship Award," but gave the plaintiff the "Most Likely to go to Broadway Award," because the plaintiff was the "girl who brings all the drama to the class." (*Id.* ¶ 94.) The plaintiff objected to the teacher's comments, and the principal disciplined the teacher. (*See id.*)

The plaintiff's parents contacted Zito about the awards ceremony incident, and asked him to separate the bullies and the plaintiff. They also asked Zito to make a complaint under New York's Dignity for All Students Act ("DASA").[3] (*Id.* ¶¶ 13–15, 101–103.) Zito refused to file a DASA complaint. He explained that the plaintiff could not hug other students because of the school's "no contact policy." (*See id.* ¶ 99.) He did, however, add the plaintiff's name to a "healthy separations" list for the next year. (*Id.* ¶ 103.) After the plaintiff's parents filed a DASA

---

[3] The New York Education Law mandates that school districts receive, investigate, and address reports of harassment, bullying, and discrimination in New York schools. N.Y. Educ. Law § 13. Under Miller Place's Student Harassment and Bullying Policy, parents may file harassment reports to designated coordinators in each school. (ECF No. 51 ¶ 13.) The coordinator must investigate complaints, determine whether the complaint is founded, and address whether the school must deploy accommodations to ensure student safety. (*Id.* ¶¶ 15–17.) Complainants may appeal the coordinator's determination to the school district and request an informal hearing. (*Id.* ¶ 15.)

complaint on June 24, 2022 (*see id.* ¶¶ 101–05), Christopher Herrschaft, who was the principal at the time, "deemed the complaint regarding A.M.'s comments 'unfounded'" (*id.* ¶ 106). When the plaintiff's parents suggested that they might move her to private school, administrators promised to give the plaintiff an "open door" to report bullying directly to Zito. (*Id.* ¶¶ 113, 117.)

At one point, the plaintiff told her mother that "she did not want to live anymore." (*Id.* ¶ 80.) She had "panic attacks," "increased anxiety, sleep difficulties, self-esteem issues and body image disturbances." (*Id.* ¶¶ 92, 101.) She avoided school, and her grades dropped. (*Id.* ¶ 97.) A doctor diagnosed her with anxiety and depression. (*Id.* ¶ 111.)

Students continued to bully the plaintiff in the fifth grade. Some students commented about the plaintiff's sexuality and intelligence. They called her "fat," "ugly," "motherfucker," a "piece of shit," "bitch," "whore," and told her to kill herself because her life was "pointless anyway." (*Id.* ¶¶ 125–29.) Another fifth grader, O.D., mocked the plaintiff's hair, teeth, and face. (*Id.* ¶ 139.) Teacher Lisa Bray and two social workers told O.D. to "stay away" from the plaintiff, but in December 2022, Bray seated the plaintiff next to O.D. and refused to let her change seats. (*Id.* ¶¶ 139, 144.) Two students, who were "a few feet away" from Bray and another teacher, Jordan Beth Fiore, said it was "disgusting" that the plaintiff was gay. (*Id.* ¶¶ 127, 132.) Another time, when the plaintiff was on the bus, three students made fun of her clothes. (*Id.* ¶ 137.) C.V. called the plaintiff a "retarted [sic] faggot" said on Snapchat that the plaintiff looked like a character with facial deformities, and threatened that he and other students would "hunt" her. (*Id.* ¶¶ 140, 143.) C.V. also banged on the bathroom door while the plaintiff was inside. (*Id.* ¶ 203.) In the fall, three students "cornered" the plaintiff, in view of the lunch aides, even though school staff had instructed the students "not to interact" with the plaintiff. (*Id.* ¶ 134.) Other students told the plaintiff about

4

the "[C.D.] Touch" rumor—that touching the plaintiff would "turn" them gay—but stopped after Farley spoke to them.  (*Id.* ¶ 189.)

Some of the bullying was more sexual in nature.  On the bus, C.F. took the plaintiff's phone and played "sexual videos/songs," which he asked the plaintiff to watch.  (*Id.* ¶¶ 122–23.)  He repeatedly asked plaintiff to watch pornography, even though she said it made her uncomfortable.  (*Id.* ¶ 123.)

Zito, now the principal (*id.* ¶ 110), addressed some of the plaintiff's concerns.  He told the plaintiff's mother that he would remind lunch aides "not to encourage interactions" between the plaintiff and the bullies.  (*Id.* ¶ 135.)  Zito said that the boys who made fun of plaintiff's clothing were "good kids" and described the teasing as "an isolated incident."  (*Id.* ¶ 138.)  In addition, the school rescheduled the plaintiff's lunch period, so that she would not have to eat with the girls "who were ostracizing" her.  (*Id.* ¶ 219.)  On the other hand, Zito told plaintiff's parents not to be concerned about C.F.  (*Id.* ¶ 146.)  He did not discipline C.F., even though the plaintiff reported "daily sexual harassment . . . right after she got off the bus."  (*Id.* ¶ 145.)  The school did not address the plaintiff's report that C.V. called her a "retarted faggot."  (*See id.* ¶¶ 140–41.)  The day after the plaintiff's parents complained about C.V.'s Snapchat comment, social worker Nicole Werner pulled the plaintiff aside and said, "We don't say 'gay' here."  (*Id.* ¶ 142.)

When Zito took medical leave from January to March 2023, Bray and Fiore did not let the plaintiff leave during class to report bullying.  (*Id.* ¶¶ 171–73.)  Students commented on the plaintiff's sexual orientation with increasing frequency.  (*Id.* ¶ 171.)  One student, G.L., asked plaintiff why she was not heterosexual, and called her a "fat pig."  (*Id.* ¶¶ 172, 192.)  Bray disciplined G.L. and told the bullies that "it wasn't okay to talk about someone's sexual orientation that way."  (*Id.* ¶ 172.)  Privately, however, she warned the plaintiff not to discuss her sexual

orientation in school. (*Id.*) In February 2023, the plaintiff told her mother that O.D. and another student "smacked" her. (*Id.* ¶ 155.) The plaintiff's parents reported the incident to Farley, who responded that it was "okay because it was 'Smack Your Friend in the Face Day.'" (*Id.* ¶ 159.)

C.F. continued to show the plaintiff sexual videos and make sexual comments. When the plaintiff told him to stop, he and another student responded, "It doesn't matter because you are gay." (*Id.* ¶¶ 161–62.) Interim administrator Tom Meehan, who was filling in for Zito, told the plaintiff's parents that he would assign a behavioral counselor to walk the plaintiff to the bus pick-up area. He also said that he would give C.F. a punishment when he returned from a break. (*Id.* ¶¶ 153, 167.) The bus driver assigned C.F. a seat in the front of the bus, and the plaintiff in the rear (*id.* ¶ 169), but C.F. "stalked" the plaintiff until the bus driver told him to stay in his seat (*id.* ¶ 187). C.F. wanted his friend "to communicate with [the plaintiff] on [C.F.'s] behalf," so he texted the friend that the plaintiff was a "bitch," "too white," and "ugly." (*See id.* ¶¶ 169, 187.) On March 11, 2023, C.F. forwarded "all texts between himself and" the plaintiff to his friend. (*Id.* ¶ 185.) Counselor Nicole Lazar saw the texts on C.F.'s phone and deleted them. (*Id.*)

After Zito returned, Bray and Fiore still refused to let the plaintiff leave class to see him. (*Id.* ¶ 174.) School officials viewed her complaints with skepticism. When the plaintiff reported that another student was "mean" to her, Bray accused her of lying. (*Id.* ¶ 175.) Another time, at recess, C.F. tried to trip the plaintiff by throwing basketballs at her. He stopped when the plaintiff called for Zito, who concluded that C.F. "had done nothing wrong." (*Id.* ¶¶ 219–21.) When the plaintiff's parents reported that O.D. was encouraging students to yell at the plaintiff, Zito and Farley told them that they had "done all they can." (*Id.* ¶¶ 176–77.) The plaintiff tried to draw attention to bullying by "yelling loudly," but Bray disciplined her. (*Id.* ¶ 180.) She also told Bray that other students said that they thought the plaintiff "was a terrible singer." (*Id.* ¶ 201.) Bray

6

gave her a "behavior check point" and reprimanded her for "telling" on her peers. (*Id.*) The gym teacher told the plaintiff to "suck it up" when G.L. kicked her in front of two other students. (*Id.* ¶ 180.) Farley, too, rejected the plaintiff's accusations, and said "that G.L. could not have kicked [the plaintiff] in the back during gym because Lazar went down to the gym and Zito had also stopped in." (*Id.* ¶ 196.)

C.F.'s behavior got worse. He and another student told the plaintiff every day for weeks that "Rape Day is coming," which was "a TikTok joke but not really." (*Id.* ¶ 200.) In April 2023, he snuck up to the plaintiff on the bus, grabbed her by her thighs, pulled her onto his lap, and tried to kiss her. (*Id.* ¶ 223.)

The plaintiff saw a therapist, took depression medication, and tried to avoid school functions. (*Id.* ¶ 166.) She withdrew from the school chorus to avoid O.D. and C.F. (*id.* ¶ 148), and was not going to audition for the school musical, until Farley urged her to audition (*id.* ¶¶ 216–18).

On April 11, 2023, the plaintiff's parents filed an internal DASA complaint. (*Id.* ¶ 205.) They objected to eight incidents: (1) C.V. calling the plaintiff a "fucking retart" on Snapchat, (2) O.D. and another student smacking the plaintiff, (3) C.F.'s comments on the bus, (4) C.F. following the plaintiff on the bus and forwarding her texts to another student, (5) G.L. kicking the plaintiff and asking her why she was gay, (6) other students "ostracizing" the plaintiff at lunch and calling her a "fat pig," (7) students mocking the "musical theater performances" the plaintiff posted on TikTok, and (8) C.V.'s and G.L.'s "specific ongoing comments" about the plaintiff's sexuality. (*Id.* ¶¶ 206–13.) Zito, the DASA coordinator, responded. He found that the first, third, fourth, seventh (as to two students), and eighth (as to G.L.) claims constituted bullying. (*Id.* ¶¶ 226, 228–29, 232–33.) He concluded that the rest were either unfounded or were not bullying. (*Id.* ¶¶ 227–

33.)  Zito determined that the bullying was "addressed at the building level," declined to institute additional accommodations, and refused to move the plaintiff to a different classroom.  (*Id.* ¶¶ 225–27, 234–35.)

The plaintiff's parents appealed the "unfounded" determinations to Seth Lipshie, district superintendent.  (*Id.* ¶ 246.)  Herrschaft, now the deputy superintendent, discouraged the plaintiff's parents from filing a complaint about C.F.'s April 2023 attack on the bus, claiming that the buses did not have cameras.  (*Id.* ¶ 259.)  He did not respond when the plaintiff's mother told him that the plaintiff's friend saw camera footage from the school bus in connection with a separate incident.  (*Id.*)  The plaintiff's parents filed a separate complaint about the April assault, which Zito ultimately dismissed as "unfounded."  (*Id.* ¶ 262.)

Herrschaft advised the plaintiff's parents of his determination of their appeal by letter.  (*Id.* ¶ 266.)  He maintained that the smacking incident was "unfounded" because "there was no intent by either student to cause physical or emotional harm to Claire, as the students were following an (albeit inappropriate) social trend of 'slap your friend day.'"  (*Id.* ¶ 267.)  He upheld Zito's findings that the "fat pig" complaint was not credible because the plaintiff "changed her story" about whether the student mouthed the comment or yelled it across the cafeteria.  (*Id.* ¶ 268.)  He also found that plaintiff's claims that G.L. and C.V. commented about her sexuality were not credible because she "retracted her story" and changed the facts over time.  (*Id.* ¶ 270.)  The plaintiff maintains that she did not change or retract either account.  (*Id.* ¶¶ 269, 271.)

By this point, plaintiff was attending school from home "due to her anxiety and depression over the bullying."  (*Id.* ¶ 249.)  Although students who attend school from home must have five hours of online tutoring a week, the plaintiff claims that she got only three hours.  (*Id.* ¶¶ 250–52.)  Once, C.F. circled the plaintiff's block for an hour, which the plaintiff reported to her parents; her

parents complained to Zito, called the police and filed a report.  (*Id.* ¶¶ 257, 263–64.)  C.F.'s father confronted them angrily, challenged the plaintiff's father to a fight, and called the plaintiff's mother a "fucking cunt."  (*Id.* ¶ 272.)

The plaintiff ultimately transferred to a private school.  Shortly thereafter, Lazar and Herrschaft asked the plaintiff's sister about the plaintiff.  (*Id.* ¶¶ 261, 306.)

The plaintiff sued Miller Place, Herrschaft, Zito, Farley, and Bray.  The second amended complaint includes six counts.[4]  Count One alleges that Miller Place violated Title IX by deliberately ignoring the plaintiff's reports of harassment based on her sex and sexual orientation, and by treating her differently than heterosexual students.  (*Id.* ¶¶ 326–50.)  Count Two alleges that Miller Place violated Title IX by "forc[ing the plaintiff] to endure a hostile environment."  (*Id.* ¶¶ 351–57.)  Count Three alleges that Miller Place retaliated against the plaintiffs because she and her parents complained.  (*Id.* ¶¶ 358–71.)  Count Four alleges that Miller Place, Herrschaft, Zito, and Farley violated her rights to equal protection under Section 1983 because they did not adequately resolve her complaints, and told her not to hug other students or discuss her sexuality. (*Id.* ¶¶ 372–88.)  Count Five alleges that all the defendants retaliated against the plaintiff for filing DASA complaints, in violation of her First Amendment rights.  (*Id.* ¶¶ 389–96.)  Count Six alleges that Miller Place, Zito, and Bray violated her free-speech rights by saying she could not discuss her sexuality at school.  (*Id.* ¶¶ 406–11.)

The defendants move to dismiss the complaint.

---

[4] Although the original complaint includes claims by A.D., the Second Amended Complaint includes onlythe plaintiff's claims.  Because an amended complaint supersedes the pleading it modifies, *Laza v. Reish*, 84 F.3d 578, 581 (2d Cir. 1996), the Clerk of Court is respectfully directed to amend the caption in this case to remove A.D.

## STANDARD OF REVIEW

A complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) only when it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court evaluating a Rule 12(b)(6) motion "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022).  But "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss.  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted); *see Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (quotation marks, brackets, and citations omitted)).[5]

## DISCUSSION[6]

### I.    Title IX Claims

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The

---

[5] The plaintiff's motion (ECF No. 64) to convert the defendants' motion into a summary judgment motion is denied.  While the defendants attached exhibits to their motion, they did not rely on them, and the Court does not consider them.  Nor will the Court deny the defendants' motion because they did not timely file a cover letter in accordance with Judge Kovner's Individual Practice Rules.

[6] Although the plaintiff sought injunctive and declaratory relief in the second amended complaint, she has advised the Court that "[i]njunctive relief is no longer at issue" because "it was dropped."  (ECF No. 64).  Even if she were seeking such relief, she does not have standing, because injunctive and declaratory relief——for example, requiring Miller Place to update its policies—would not redress her injuries, which occurred in the past.  She is "thriv[ing]" at the private school she currently attends, and does not suggest that she intends to return to the defendants' school system.  (ECF No. 18 ¶ 308.)

statute operates "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). At issue here is Title IX's implied right to sue for damages for certain violations. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

The plaintiff argues four theories of Title IX liability: (1) that the school acted with deliberate indifference to the harassment the plaintiff suffered at the hands of other students (ECF No. 51 ¶¶ 332–40); (2) that the school created a hostile environment based on sex (*id.* ¶¶ 351–57); (3) that the school district discriminated against her on the basis of her sexual orientation (*id.* ¶¶ 341–50); and (4) that the school retaliated against her for attempting to assert her statutory rights under Title IX (*id.* ¶¶ 358–88). The Court addresses each claim in turn.

### A.    Deliberate Indifference

A school's failure to prevent student-on-student sexual harassment may "rise to the level of discrimination actionable under" Title IX. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Damages are available if the plaintiff establishes three elements: that the harassment was "so severe, pervasive, and objectively offensive" that it "effectively denied equal access" to school resources, *id.* at 652; that an official with "authority to address the alleged discrimination and to institute corrective measures" had "actual knowledge" of the harassment, *Gebser*, 524 U.S. at 290; and that the response amounted to "deliberate indifference," *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Gebser*, 524 U.S. at 290). Because "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648, the official response must be "'clearly unreasonable' in light of known circumstances," *Papelino*, 633 F.3d at 89 (citation omitted). In this Circuit, a response that is "not reasonably calculated to end harassment"—such as continuing to employ methods that the district knows are ineffective—is clearly unreasonable. *See Zeno v. Pine Plains*

11

*Cent. Sch. Dist.*, 702 F.3d 655, 664–65, 669 (2d Cir. 2012) (using this standard in the Title VI context, which embraces Title IX's deliberate-indifference standard for peer-harassment claims).

The plaintiff advances two theories of deliberate indifference.  First, she alleges that the school's response to sexual harassment was inadequate.  (ECF No. 51 ¶¶ 328, 332–40.)  Second, she claims that the school's response to bullying—including students who "smack[ed]" her, called a "retarted faggot," and harassed her because she disclosed that she was gay—was inadequate. (*Id.* ¶¶ 127, 140, 143, 189.)

The standard for peer harassment is stricter than that for teacher-student harassment. *Davis*, 526 U.S. at 653.  For instance, "insults, banter, teasing, shoving, and pushing" are not enough, nor does a "decline in grades" alone establish objective offensiveness.  *Id.* at 651–52 (quotation marks and citation omitted).  On the other hand, bullying that requires students to seek professional help, or consider self-harm, is sufficient.  *See, e.g.*, *Cianciotto ex rel. D.S. v. N.Y.C. Dep't of Educ.*, 600 F. Supp. 3d 434, 455–56 (S.D.N.Y. 2022) (finding bullying that made plaintiff lose sleep, miss school, and turn to therapy sufficiently severe); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 358 (S.D.N.Y. 2014) (finding antisemitic harassment that led student to withdraw from school sufficiently severe in Title VI context), *abrogated on other grounds*, *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86 (2d Cir. 2020).  The plaintiff plausibly states a Title IX claim under the first theory—that the defendants' response to sexual harassment was inadequate.  She demonstrates that she experienced severe harassment that deprived her of equal access to education.  *Papelino*, 633 F.3d at 89.

The complaint describes far more than "childish teasing and insults."  (ECF No. 63-13 at 20.)  On the contrary, the plaintiff alleges objectively offensive and pervasive harm.  In kindergarten, a child pushed her against the school bus and kissed her.  (ECF No. 51 ¶ 40.)  When

12

she was in fifth grade, C.F. "grabbed" her "by her thighs, pull[ed] her down the seat and onto his lap," and "tried to kiss her." (*Id.* ¶ 223.) He "moan[ed] sexually in her ear or her face" (*id.* ¶ 66), played "sexual videos/songs" on the school bus (*id.* ¶¶ 122–23), and persisted in talking to her about sex even after she told him to stop (*id.* ¶ 161). The harassment involved threats of violence. O.D. threatened that he and other students would "hunt" her, and G.C. (another student) and C.F. repeatedly warned her that "Rape Day is coming." (*Id.* ¶¶ 143, 200.) As a consequence, the plaintiff suffered from anxiety, sleep deprivation, she missed school to attend therapy, and she eventually transferred to private school. Even now, she has "nightmares, insomnia, [and] headaches." (*Id.* ¶¶ 101, 111, 325.) The harassment and its effects on the plaintiff deprived her of equal access to education.

The plaintiff also adequately alleges that the school district knew about the harassment and had the authority to address it. Her parents told the kindergarten principal that Q.C. punched her and kissed her. (*Id.* ¶¶ 40–45.) When she was in fourth and fifth grade, the plaintiff told Zito and Farley about C.F.'s behavior on the bus, and about the "Rape Day" comments. (*Id.* ¶¶ 122, 200.) Her parents also reported C.F.'s behavior to the fourth-grade teacher; Zito, in turn, spoke to C.F. (*Id.* ¶¶ 67–68.) In fifth grade, the plaintiff made "daily" reports about C.F.'s conduct on the school bus. (*Id.* ¶ 145.) Her parents filed a complaint with Zito, appealed to Lipshie, and met with Herrschaft—all of which alerted district officials to their complaints. (*Id.* ¶¶ 226–33, 266.) The majority of the harassment took place in the classroom or on the bus—where the defendants could control the students. *Cf. Pine Bush*, 58 F. Supp. 3d at 357 (finding control in Title VI case involving incidents on school bus).

Next, plaintiff plausibly alleges that the district's responses were "not reasonably calculated to end harassment." *Zeno*, 702 F.3d at 669. Zito dismissed many of the plaintiff's

concerns.  At first, he told her parents not to worry about C.F., and ignored the plaintiff's daily reports about what was happening on the bus.  (ECF No. 51 ¶¶ 145–46.)  The plaintiff and her parents also spoke to Farley about C.F., but she just shrugged her shoulders and said she "didn't know" what to do about C.F.  (*Id.* ¶ 122.)   Because the defendants did nothing to stop C.F., he persisted.  He routinely showed the plaintiff pornography, and made sexual comments.  (*Id.* ¶¶ 153, 161.)

School officials eventually responded by seating C.F. and plaintiff in different parts of the bus.[7]  But that did not stop C.F. from harassing the plaintiff.  He grabbed her, pulled her on his lap, and tried to kiss her, an attack that the plaintiff reported to Farley and Zito.  (*Id.* ¶ 223.)  School officials did not investigate the complaint, or talk to the plaintiff's parents about filing a school "Sexual Harassment" complaint.  *See Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1095 n.6 (2d Cir. 2024) (finding procedural irregularities in school's response probative of indifference).

The Board officials were similarly unresponsive.  Herrschaft rejected the plaintiff's report that C.F. tried to kiss her as "unfounded," without looking into whether there was video footage from the bus.  He also declined to assign the plaintiff to a different bus.  (ECF No. 51 ¶¶ 259, 262.) He discouraged the plaintiff's parents from filing a complaint, and did not investigate the bus incident.  (*Id.* ¶¶ 258, 262.)  These allegations are sufficient to allege deliberate indifference—a lack of effort "to investigate or put an end to the harassment," *Davis*, 526 U.S. at 654—by Miller Place.

The defendants maintain that they took reasonable steps to respond to the plaintiff's reports; they point out that they separated the plaintiff and the bullies, assigned a social worker to walk her to the bus, and gave her a way to notify Zito when she felt unsafe.  (ECF No. 63-13 at

---

[7] The defendants do not contest that the principals have policymaking authority.

29.)  But the plaintiff alleges that the defendants did not act quickly enough to protect her.  They waited for an entire semester before finally separating the plaintiff and C.F., after Zito and Farley had taken no action.  (*See* ECF No. 51 ¶¶ 122, 187.)  *Cf. Zeno*, 702 F.3d at 669–70 (finding delay after school officials learned about of peer harassment evidence of deliberate indifference).  And some of the measures were not especially effective.  The defendants assigned a social worker to walk plaintiff to the bus, but that did not protect her from C.F. once she was on the bus.  (*See* ECF No. 51 ¶ 285.)  Zito's open-door policy enabling the plaintiff to make reports, was of little use, because, as the complaint alleges, he did not respond to the plaintiff's complaints when she reported them.  (*Id.* ¶ 145.)  Seating C.F. away from the plaintiff on the bus, as the defendants did, was not effective; C.F. still tried to kiss her and sent texts about her.  Herrschaft and Lipshie did not respond reasonably.  They concluded that the plaintiff's complaints were unfounded, without investigating the plaintiff's allegations, and without implementing additional measures to separate C.F. and the plaintiff.  (*Id.* ¶¶ 246, 259, 262.)  At this stage of the litigation, the plaintiff has plausibly stated a claim for relief under Title IX.

Because the plaintiff states a plausible claim for relief under one theory, the Court does not address whether Title IX authorizes sexual orientation discrimination claims for damages, a question that the Second Circuit has not addressed.  If a party sets out "2 or more statements of a claim or defense alternatively or hypothetically" in a single count, "the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d)(2).  Courts in this Circuit routinely decline to address alternate theories of discrimination when one suffices to state a plausible claim for relief.  *See, e.g.*, *Cianciotto*, 600 F. Supp. 3d at 458 n.11 (declining to address whether teachers "directly harassed" student in blocking presentation on LGBTQ issues after finding them deliberately indifferent to peer harassment already); *Facci-Brahler v. Montgomery County*, No. 18-CV-0941,

2021 WL 1224048, at *3 n.3 (N.D.N.Y. Mar. 31, 2021) (refusing to address alternate bases for discrimination when plaintiff adequately pleaded one); *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 492, 496–97 (E.D.N.Y. 2011) (allowing plaintiffs to plead age and sex discrimination as alternative theories in challenging their terminations).

The plaintiff alleges a single "pattern and practice of deliberate indifference" to her reports of persistent harassment.  (ECF No. 51 ¶ 339.)  Because of that indifference, students bullied the plaintiff on the basis of her sex and because of her sexual orientation, and also subjected her to more garden-variety bullying and name-calling.   The overall pattern of conduct is a set of "operative facts" that gives rise to an enforceable right.  *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir. 1943).  The separate acts of bullying form a single pattern of misconduct that changed the terms of the plaintiff's educational experience.  *Cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (understanding "a hostile work environment claim" as "a series of separate acts that collectively constitute one unlawful employment practice" (internal quotation marks and citation omitted)); *cf., e.g.*, *Tromblee v. New York*, No. 19-CV-0638, 2021 WL 981847, at *11 (N.D.N.Y. Mar. 16, 2021) (understanding retaliatory-hostile-work-environment claim as single claim alleging two theories: either that "numerous alleged retaliatory acts" each individually harmed plaintiff or that "the sum total [was] materially adverse").

## B.    Hostile Educational Environment

The plaintiff's hostile-environment claim is identical to her deliberate-indifference claim. Title IX permits a plaintiff to recover damages if a school creates a sexually hostile environment that deprives her of "the ability to enjoy the benefits of" a federally funded educational program. *Roe v. St. John's Univ.*, 91 F.4th 643, 661 (2d Cir. 2024).  To prevail, plaintiff must show that the environment was objectively "hostile or abusive" such that it "alter[ed] the conditions of [the]

16

educational environment." *Id.* (quoting *Papelino*, 633 F.3d at 89).  The school is liable for peer harassment only if it was deliberately indifferent.  *Id.* (quoting *Davis*, 526 U.S. at 633).

That standard is the same standard for the deliberate indifference claim.  *See, e.g.*, *Cianciotto*, 600 F. Supp. 3d at 451–52 (treating hostile-environment claim involving peer harassment as deliberate-indifference claim).  The "essence of each claim" is the hostile environment, which the defendants exacerbated by their inadequate response to the bullying.  *Cf.* *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 544–45 (2d Cir. 1999).  Indeed, the plaintiff discusses her deliberate-indifference and hostile-environment claims under one heading, one rule, and one standard, and relies on the same facts.  (ECF No. 64 at 20–23.)  Because the plaintiff's hostile-environment claim duplicates her deliberate-indifference claim, it is dismissed.  *See, e.g.*, *Samuels v. City of New York*, No. 22-CV-1904, 2023 WL 5717892, at *11 (S.D.N.Y. Sept. 5, 2023) (collecting cases dismissing harassment claims as duplicative of hostile work environment claims).

### C.    Disparate Treatment

The plaintiff does not state a plausible Title IX disparate-treatment claim.  A plaintiff may establish that a school district discriminated against her on the basis of sex if sex was a "motivating factor in the decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Alternatively, a plaintiff may establish sex discrimination if the school selectively enforced its rules on the basis of sex.  *See id.*  In either case, she must plead "specific facts that support a minimal plausible inference" of sex discrimination.  *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

Courts apply the *McDonnell Douglas* framework for these claims.  *Id.* at 55–56; *see* *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995).  Degrading criticism, invidious comments about protected groups, or favorable treatment of "similarly situated" employees outside the group may establish an inference of discrimination.  *Littlejohn v. City of*

*New York*, 795 F.3d 297, 312 (2d Cir. 2015).  The comparator must be "similarly situated to the plaintiff 'in all material respects.'"  *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (citation omitted).

The plaintiff says that the defendants discriminated against her in two ways.  First, she says that the defendants discriminated against her by rejecting her bullying complaints as unfounded. (ECF No. 51 ¶¶ 341, 383.)  She alleges that the defendants did not investigate her claims, did not separate her from the bullies, discipline them, or tell the plaintiff's parents that they could file Title IX or DASA complaints.  (*Id.* ¶¶ 341–49.)  The plaintiff's second theory of discrimination is premised on her fourth-grade counselors' instruction that she not "hug the other girls," while permitting other students to hug one another, as evidenced by yearbook and presentation pictures, taken by the staff.  (*Id.* ¶¶ 85, 93; ECF No. 64 at 20.)  The plaintiff also alleges that Werner and Bray treated her differently on the basis of sex when Werner told her, "[W]e don't say gay," and when Bray instructed her to "stop talking about her sexuality."  (ECF No. 51 ¶ 341.)

The first theory largely duplicates her Title IX claim: that the defendants were deliberately indifferent to her claims of harassment.[8]  (*See id.* ¶¶ 343–45, 348–49.)  The plaintiff also suggests that Zito discriminated against her when he credited C.F.'s claim that he did not throw basketballs at her, presumably because Zito believed that C.F. was more believable because he was a boy, and rejected the plaintiff's claim because she was a girl.  (*Id.* ¶¶ 219–21, 349.)  That argument is not persuasive.  First, C.F. is not comparable to the plaintiff; he was not complaining about harassment. *Radwan*, 55 F.4th at 132.  Thus, Zito was not treating similarly situated people differently. Moreover, as the plaintiff concedes in the complaint, Zito did not see C.F. throw basketballs.

---

[8] The plaintiff also says that the defendants discriminated against her because school board officials said that "bullies ha[ve] rights," but that is not discrimination on the basis of sex.  (ECF No. 51 ¶ 345.)

Nor is the second theory sufficient to state a claim of discrimination on the basis of sex. The plaintiff cites the counselors' and Zito's instruction that she not hug students, while permitting other students to hug one another.  (ECF No. 64 at 19–20; ECF No. 51 ¶ 85.)  But the other students were not similarly situated to the plaintiff in all material respects.  When Zito and the counsellors told the plaintiff not to hug other students, they were responding to students who said that they did not want the plaintiff to hug them.  (ECF No. 51 ¶ 93.)  That is not discrimination on the basis of sex.[9]

### D.    Retaliation

The plaintiff does not state a plausible claim for retaliation.  A funding recipient who "retaliates against a person because he complains of sex discrimination" also discriminates on the basis of sex. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  To make out a *prima facie* claim, the plaintiff must plead four elements: (1) protected activity by the plaintiff, (2) knowledge by the defendant, (3) adverse action by the school, and (4) a causal connection between the protected activity and adverse action.  *Papelino*, 633 F.3d at 91 (citation omitted).

At issue here are the third and fourth elements.  In this Circuit, an adverse action "under both Title VII and Title IX" must dissuade a reasonable person from making a complaint.  *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 495 (S.D.N.Y. 2023) (quoting *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010)).  Failing to investigate the complaint typically does not amount to adverse action, because a failure to investigate places the plaintiff in the same situation she "would have been had she not brought the complaint"; thus, the plaintiff has "nothing

---

[9] As pled in the complaint, Werner's and Bray's remarks about discussing sexual orientation at school do not support a sex discrimination claim. Werner and Bray are teachers, and school districts are not vicariously liable for the actions of individual teachers or behavioral counselors.  *Gebser*, 524 U.S. at 287–88.  Nor is there any evidence that Werner and Bray had decision-making authority for Miller Place. Moreover, the plaintiff does not allege that other students were permitted to discuss their sexual orientations, or that the plaintiff was treated differently on the basis of sex.

to lose." *Fincher*, 604 F.3d at 721–22.  In order to constitute retaliation, the conduct must actively dissuade the complainant from complaining.  Examples include refusing to consider other complaints or punishing her.  *See id.* at 722.

As to causation, the Second Circuit has not decided whether Title IX claims must establish—as Title VII claims must—whether the protected activity was a "but for" cause of the adverse action, or simply a "motivating factor in the decision to discipline." *Radwan*, 55 F.4th at 131 (quoting *Yusuf*, 35 F.3d at 715).  The plaintiff does not state a claim under either standard.  A court determining whether an action is a motivating factor considers the defendant's statements, or "patterns of decision-making that" indicate the influence of gender.  *See Yusuf*, 35 F.3d at 715. For instance, a "[c]lose temporal proximity" between the protected activity and the retaliatory act may suffice.  *Papelino*, 633 F.3d at 91 (quoting *Kaytar v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)).  But "an intervening causal event" may disrupt a causal inference.  *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).

The plaintiff alleges that the defendants retaliated against her in multiple ways: refusing "to address all of [her] complaints" (ECF No. 51 ¶ 362), inadequately punishing Warren for giving the plaintiff the "bringing the drama" award, failing to report the smacking incident, giving the plaintiff insufficient tutoring hours, not letting her bring a book to lunch, assigning "behavior check" points when she reported G.L. for bothering her, and "harass[ing]" her sister after the plaintiff withdrew from the school (ECF No. 64 at 23–24).

None of those actions supports a plausible retaliation claim.  Failing to respond to the plaintiff's complaints left her in the same situation she was in when she filed them.  Giving Warren a "write up" instead of filing a DASA complaint for the "Most Likely to go to Broadway Award" incident (ECF No. 51 ¶ 94) was not an adverse action against the plaintiff, and would not dissuade

20

a reasonable person from asserting her rights under Title IX.  Although giving the plaintiff three hours of tutoring instead of five was inadequate, it does not make out a retaliation claim.  In any event, Bray, the teacher who gave the plaintiff the tutoring hours, was not a decision maker. *Gebser*, 524 U.S. at 287–88.

Finally, the plaintiff cites Bray's direction that the plaintiff "could not speak about her homosexuality at school" as evidence of retaliation.  (ECF No. 51 ¶ 364.)  But the plaintiff cites no evidence, including temporal proximity, that connects Bray's comment and the plaintiff's DASA complaints.  Moreover, the plaintiff concedes that Bray told the students who mocked the plaintiff that "it wasn't okay to talk about someone's sexual orientation that way" as a response to the concern that "sexual orientation bullying by the other kids had become an everyday occurrence."[10]  (*Id.* ¶¶ 172, 283.)

## II.    Section 1983 Claims

The plaintiff's First Amendment claims are dismissed for failure to state a claim upon which relief may be granted.  However, the plaintiff states a plausible claim that Miller Place, Herrschaft, Zito, and Farley violated Section 1983 and the Equal Protection Clause.

### A.    First Amendment Retaliation Claim

Public officials may not retaliate against someone for exercising a constitutional right, even if their conduct might be proper when motivated by different reasons.  To prevail on a First Amendment retaliation claim under § 1983, the plaintiff must show that (1) she engaged in

---

[10] The complaint also includes other complaints: that she received a "behavior check" point for complaining about students' comments on her TikTok posts (ECF No. 51 ¶ 201), that she could not bring a book to lunch, that Zito made an angry remark to her father, and that Herrschaft asked her sister about the plaintiff after the plaintiff transferred to private school. These incidents do not establish retaliation. *Cf. Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (finding trivial punishments insufficiently adverse).

protected speech, (2) the defendants took adverse action against her, and (3) there was "a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted). An action is adverse if it "would deter a similarly situated individual of ordinary firmness from exercising" her constitutional rights. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). While there are no bright-line rules, courts in this Circuit have held that the improper investigation of a complaint typically cannot be an adverse action in retaliation for filing that same complaint. *Kelly v. N.Y. State Off. of Mental Health*, 200 F. Supp. 3d 378, 404–05 (E.D.N.Y. 2016); *Houston v. Schriro*, No. 11-CV-7374, 2013 WL 4457375, at *10 (S.D.N.Y. Aug. 20, 2013) ("Ignoring grievances cannot support a First Amendment retaliation claim."). Like in the Title VII context, courts typically require "[a]ffirmative efforts to punish a complaining employee." *Cf. Fincher*, 604 F.3d at 722.

The plaintiff cites the following incidents as evidence of first amendment retaliation: the defendants "gaslighted" her by discouraging her from filing DASA complaints, and then paying insufficient attention to the complaints; refused to let her see Zito; refused to separate her from the bullies; seated her next to O.D.; gave her a "behavior check" for reporting harassment; and refused to "send home work when" she was sick. (ECF No. 51 ¶ 396.) The plaintiffs' First Amendment retaliation claim fails for the same reasons that her Title IX retaliation claim fails

School employees' "clearly inadequate or inappropriate responses to the Daly[s'] numerous complaints" are not sufficiently adverse, because the inadequate reaction would not deter a similarly situated individual from speaking. (*Id.* ¶ 395.) *Cf. Fincher*, 604 F.3d at 721–22. As explained above, *supra* Section I.D, failing to investigate a complaint does not punish the reporter for making the complaint. The plaintiff does not explain what "a behavior check" is, so there is no way to tell whether it would dissuade a reasonable person from filing complaints. (ECF

No. 51 ¶ 201.)  *See, e.g.*, *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 228 (2d Cir. 2006) (denial of emeritus status not adverse).

The plaintiff does not connect Bray's conduct—seating the plaintiff next to O.D and refusing to send her homework when was sick—to any protected activity.  She does not plead sufficient facts to show that protected speech "was a substantial motivating factor" in the assertedly adverse action.  *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (citation omitted).  There are no allegations suggesting that Bray seated O.D. next to the plaintiff in December 2022 because the plaintiff complained about O.D.  While the plaintiff claims that she complained to Zito, she does not allege that she or her parents complained about O.D. to Bray until after the plaintiff asked to change her seat.  (ECF No. 51 ¶ 144.)  Similarly, although the plaintiff claims that Bray did not send her homework when the plaintiff got the flu, the plaintiff concedes that Fiore told her parents that she could see the homework "in Google Classroom."  (*Id.* ¶ 151.)  The plaintiff claims that she was "prevented from" logging in (*id.*)—but does not cite any facts to establish that this was anything other than a technical problem.  Therefore, the plaintiff's First Amendment retaliation claim is dismissed.

## B.    First Amendment Free Speech Claim

While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), those rights are not absolute.  "[S]chool administrators may prohibit student expression that" they reasonably believe "will 'materially and substantially disrupt the work and discipline of the school.'"  *Doninger v. Niehoff*, 527 F.3d 41, 50 (2d Cir. 2008) (quoting *id.* at 513).  "[S]erious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; [and] the failure to follow rules concerning lessons" fall within the ambit of permissible regulation.  *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 188 (2021).  The plaintiff claims that

defendants violated the First Amendment when they said that she "could not hug anyone because there was a 'no-contact' policy at Miller Place," and that "she could not talk about her sexuality at school." (ECF No. 51 ¶¶ 408–09.)

Neither theory states a plausible First Amendment free speech claim. First, Zito told plaintiff not to hug the other girls because a group of them told the behavioral counselors that "they did not want [the plaintiff] to hug them." (*Id.* ¶ 93.) Indeed, Zito separated those students and the plaintiff because the plaintiff's mother reported what the students said. (*Id.* ¶ 104.) Moreover, a ban on nonconsensual touching regulates conduct and not speech, so it does not violate the First Amendment scrutiny unless the plaintiff's hugs were "intended to be communicative" and "would reasonably be understood by the viewer to be communicative." *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (setting this general standard outside the school context). The plaintiff does not allege facts suggesting that she was hugging people to express herself.

Nor has the plaintiff sufficiently pled that the defendants violated the First Amendment when Bray told her not to talk about her sexuality, and when Werner said, "We don't say gay." To state a claim under Section 1983, the plaintiff must show that defendant's actions "had some actual, non-speculative chilling effect." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam). Only then does a plaintiff establish a "specific present objective harm" for damages. *Laird v. Tatum*, 408 U.S. 1, 10, 13–14 (1972).

The complaint does not describe the circumstances under which Werner said, "[W]e don't say 'gay,'" or how the comment chilled the plaintiff from speaking about her sexuality. (ECF No. 51 ¶ 142.) Nor has the plaintiff established that Bray's direction that the plaintiff should not discuss her sexuality was a ban on speech. In addition, the complaint does not sufficiently allege that the defendants kept the plaintiff from talking about her sexuality. In fact, the plaintiff says in

the complaint that after Bray's comment, the plaintiff discussed sexuality with O.D. and her friends at lunch. (*Id.* ¶ 178.) Moreover, the plaintiff does not allege that she wanted to talk about sexuality, and that school officials kept her from doing so. (*See id.* ¶¶ 75, 127, 178.) Therefore, plaintiff fails to state a First Amendment claim.

### C.    Equal Protection Claim

The plaintiff plausibly pleads an equal protection claim. The Fourteenth Amendment Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Sexual orientation discrimination is actionable under the Equal Protection Clause. *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012). The plaintiff alleges that the defendants violated the Equal Protection Clause when the told her that she "could not hug anyone," but permitted and promoted hugging by other students. (ECF No. 51 ¶ 378.) She also contends that the defendants deprived her of school services that they gave to heterosexual students by failing prevent students from harassing her based on her sexual orientation. (*Id.* ¶¶ 380–85.)

The plaintiff's complaint about hugging does not state a plausible violation of the Equal Protection Clause. An official violates the Equal Protection Clause by selectively enforcing rules using "impermissible considerations" like race or religion. *LaTrieste Rest. & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (citation omitted). The plaintiff must show that the official treated her differently "compared with others similarly situated." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). As explained above, the plaintiff does not identify a similarly situated student whom the school treated differently.

The plaintiff's claim that the school deprived her of services that other students got states a plausible claim for relief. In this Circuit, school administrators violate equal protection principles if they act with deliberate indifference to peer harassment. *Gant ex rel. Gant v. Wallingford Bd.*

25

*of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999).  The plaintiff must show that: (1) she was "harassed by other students based on" membership in a protected category, (2) the harassment was "actually known" to defendants, and (3) the officials' response was so "clearly unreasonable in light of the known circumstances" as to create a reasonable inference that they intended the harassment to occur.  *Cf. DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (citation omitted) (race discrimination); *see T.J. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, No. 17-CV-9592, 2019 WL 13170168, at *5–6 (S.D.N.Y. Sept. 30, 2019) (extending rule to sexual orientation); *Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 194 (D. Conn. 2016) (sex).  The standard for deliberate indifference under the Fourteenth Amendment, accordingly, parallels the one in the Title IX context.  *Gant*, 195 F.3d at 140 n.5. An unreasonable reaction to peer bullying based on sex and sexual orientation violates the Equal Protection Clause.

As explained above, the plaintiff's peers subjected her to objectively offensive sexual harassment.  She alleges that students called her "disgusting" for being gay, exacerbating the already hostile environment in the school.  (ECF No. 51 ¶¶ 127, 178.)  The plaintiff plausibly establishes each defendant's personal involvement.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  She alleges that Zito knew about C.F.'s conduct, and did not respond adequately.  (ECF No. 51 ¶ 146.)  Nor did he accommodate the plaintiff after her parents objected, in the DASA complaint, to C.F.'s behavior and C.V. and G.L.'s comments about her sexuality.  (*Id.* ¶¶ 225–34.) Herrschaft rejected the plaintiff's report that C.F. assaulted her on the bus because there were no "cameras on the bus," but ignored the plaintiff's mother when she said that another student saw a video of a different incident on the bus.  (*Id.* ¶ 259.)  Herrschaft also denied the plaintiff's appeal of Zito's decision about C.V. and G.L.'s comments.  (*See id.* ¶ 270.)  Finally, the plaintiff alleges that Zito's and Farley's responses to the plaintiff's reports of sexual harassment on the bus were

26

to say that they "didn't know" what to do.  (*Id.* ¶ 122.)  Accordingly, the plaintiff plausibly establishes that Herrschaft, Zito, and Farley acted with deliberate indifference to peer harassment based on sex.

### D.    Qualified Immunity

Qualified immunity does not shield Herrschaft, Zito, and Farley against plaintiff's equal protection claim.  In this Circuit, it is clearly established that "claims of intentional race discrimination can be based on the 'deliberate indifference' of school boards, administrators, and teachers" to peer harassment.  *DiStiso*, 691 F.3d at 240–41.  That rule also protects against deliberate indifference to discrimination based on sex and sexual orientation.  *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143–44 (2d Cir. 1993); *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 758 (2d Cir. 1998) (recognizing, in dicta, right to "educational environment free of sexual harassment"); *see Windsor*, 699 F.3d at 185 (identifying sexual orientation as a quasi-suspect class); *Pratt*, 803 F. Supp. 2d at 153 & n.12 (finding that it violated clearly established law to deliberately ignore sexual orientation discrimination).  As explained above, the plaintiff plausibly alleges that the defendants offered a clearly inadequate response, evincing deliberate indifference, to her complaints of sex and sexual orientation discrimination.

### E.    Liability for Miller Place

The complaint sufficiently alleges Miller Place's liability on the Equal Protection Clause claim.  Municipal entities, including school districts, may be held liable for a Section 1983 violation if a "policy or custom" violated plaintiff's federal rights.  *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  A "policy of inaction" given "notice that [a] program will cause constitutional violations 'is the functional equivalent of a decision by the" municipal entity.  *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011).  For instance, *Monell* liability may run based on a subordinate's "persistent and

27

widespread" unconstitutional practices, if the conduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992) (citation omitted). In this Circuit, a plaintiff may also prevail "by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

The plaintiff plausibly alleges that Miller Place's "continuing failure" to discipline students constitutes a custom of refusing to address her complaints. (ECF No. 51 ¶ 387.) She filed "hundreds" of harassment reports to Zito, Farley, and Bray, of which district personnel were aware. (*Id.* ¶ 303.) Zito and Farley got the reports. The plaintiff's parents appealed their DASA complaint to Lipshie and Herrschaft about C.F.'s "myriad comments on the bus," the April 2023 assault, and students' "ongoing comments" about her sexuality. (*Id.* ¶¶ 117, 208, 213, 259–62, 295, 334.) Herrschaft also interviewed the plaintiff and met with her mother. (*Id.* ¶¶ 258–59, 266.) The plaintiff alleges that that he upheld the school's decisions, which is sufficient at this stage of the litigation to show that Miller Place knew that Laddie Decker had deliberately ignored sex and sexual orientation harassment, and acquiesced in continuing to do so.

The allegations in this case are not about a "single incident." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). Rather, the complaint describes multiple incidents of harassment and bullying over the course of years, about which the school district had "notice" and did not meaningfully investigate.

On the other hand, the plaintiff has not sufficiently alleged an informal policy to suppress First Amendment rights. As explained above, the comments from two teachers, not policy makers, do not show a widespread district custom. *Jones*, 691 F.3d at 81.

**CONCLUSION**

The defendants' motion to dismiss plaintiff's Title IX disparate treatment and retaliation claims, and Section 1983 First Amendment claims is granted.  Their motion to dismiss the Title IX deliberate indifference and Section 1983 equal protection claims against Miller Place, Herrschaft, Bray, and Farley is denied.

SO ORDERED.

s/Ann M. Donnelly
Ann M. Donnelly
United States District Judge

Dated: December 3, 2025
       Brooklyn, New York